# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

JEFFREY SCOTT,

          **Plaintiff,**

          v.                         **Case No. 14-CV-908**

JESSIE SCHNEIDER,
GABRIEL UMENTUM,
JOSEPH BEAHM, and
JEFFREY GILL,

          **Defendants.**

---

## ORDER

---

Plaintiff Jeffrey Scott, who is representing himself, filed a complaint pursuant to 42 U.S.C. §1983 alleging that his civil rights were violated while he was incarcerated at Waupun Correctional Institution (Waupun). The court screened Scott's complaint pursuant to 28 U.S.C §1915A(a) and allowed him to proceed with his claims that the defendants violated the Eighth Amendment's prohibition against cruel and unusual punishment when they conducted a strip search without any penological justification.

On March 11, 2016, the defendants filed a motion for summary judgment. That motion was fully briefed on April 28, 2016. On June 15, 2016, the court ordered the

defendants to supplement their summary judgment materials to address specific questions posed by the court. The defendants did so on July 5, 2016. Although the court gave Scott the opportunity to respond to the defendants' additional materials, he has not done so. For the reasons explained below, the court grants the defendants' motion and dismisses this lawsuit.

## I. FACTS

The facts are primarily taken from "Defendants' Reply to Plaintiff's Response to Defendants' Proposed Findings of Fact." (ECF No. 68.) Additional facts are taken from Defendants' Supplemental Proposed Findings of Fact. (ECF No. 71.) The facts are undisputed unless noted otherwise.

At all relevant times Scott was confined at Waupun. (ECF No. 68 ¶1.) Defendants Joseph Beahm and Jeffrey Gill are employed by the Wisconsin Department of Corrections (DOC) as correctional officers at Waupun. (*Id.* at ¶3-4.) Defendant Jessie Schneider is employed by the DOC as a supervising officer 1 (lieutenant) at Waupun. (*Id.* at ¶5.) And defendant Gabriel Umentum is employed by the DOC as a correctional sergeant at Waupun. (*Id.* at ¶6.)

On November 11, 2013, Beahm was conducting a standard wellness check (i.e., count) of lower B-Range, where Scott was housed. (*Id.* at ¶32.) During such checks staff members are required to view an inmate's skin and movement. (*Id.*) Although prison

procedures allow an inmate to rest or sleep with something over his eyes, his mouth and the lower part of his face must be visible to security staff. (*Id*.)

When Beahm arrived at Scott's cell he was unable to see Scott's skin because blankets were covering his entire body. (*Id.* at ¶33.) According to Beahm, he knocked numerous times on Scott's door and yelled loudly at Scott to make some type of movement but received no response. (*Id.* at ¶34.) Beahm notified Umentum, who was able to get a response from Scott about five minutes later. (*Id.* at ¶35.)

Beahm decided to write a conduct report and fill out a restriction form to place Scott on a linen restriction based on Scott's refusal to obey Beahm's orders to uncover and show movement. (ECF No. 71 ¶¶97, 101.) According to Beahm, inmates are placed on restrictions based on the items they misuse. (*Id.*) Because Scott abused his linen by completely covering himself and thwarting Beahm's attempt to confirm his well-being, Beahn recommended that Scott's use of linen be restricted (i.e., he would be restricted to one blanket and one washcloth). (ECF No. 68 ¶37; ECF No. 71 ¶105.)

Scott argues that Beahm did not have authority to place him on such a restriction. (ECF No. 68 ¶36.) This appears to be true; however, Beahm explains that, when a restriction form is submitted, it goes into effect immediately while a security supervisor and the security director decide whether to approve it. (*Id*.) If the security supervisor or the security director do not approve the recommended restriction, the inmate is removed from the restriction. (*Id*.)

3

As a result of being placed on the linen restriction, Schneider and other staff went to Scott's cell to retrieve his linen. (*Id.*) Scott refused numerous directives to hand his linen to jail staff. (*Id.*) Schneider states that, because Scott had been uncooperative several times that morning, Schneider decided to order a strip search to make sure that Scott did not have any contraband. (*Id.* at ¶41; ECF No. 71 ¶109.) According to Schneider, if an inmate is uncooperative, it is usually for a reason. (ECF No. 68 ¶42.) Thus, when an inmate exhibits behavior indicating that he may be hiding contraband, such as refusing to uncover himself or refusing to hand out his linen, a supervisor will order that the inmate be strip searched. (ECF No. 71 ¶108.)

A cell extraction team was eventually assembled to remove Scott from his cell; however, a correctional officer (who is *not* named as a defendant) was able to get Scott to agree to come out of his cell voluntarily and go to the strip cell. (ECF No. 68 at ¶39.) Once at the strip cell, Scott refused to comply with a voluntary strip search, so Schneider directed Gill to perform a staff-assisted strip search. (*Id.* at ¶39, 42.)

Generally, a strip search is performed as follows: correctional staff direct the inmate to remove all clothing and hand it over to the searching staff member. (*Id.* at ¶19.) Once the inmate is naked, the staff member visually inspects the inmate's entire body, including hair, ears, mouth, nose, hands, armpits, groin area, between toes, bottoms of feet, inner portions of the legs, and rectum. (*Id*.) The staff member then inspects the inmate's clothing and personal articles and returns them to the inmate. (*Id*.)

4

When an inmate displays non-compliant behavior immediately prior to a strip search, staff conduct a staff-assisted strip search. (*Id.* at ¶22.) In a staff-asssited strip search, the inmate is restrained and two officers maintain hands-on control of the inmate by holding on to his arms. (*Id.*) A third staff member cuts off the inmate's clothing and inspects the clothes for contraband. (*Id.*) The staff member then visually inspects the inmate's body. (*Id.*) Because the inmate is restrained, the staff member conducting the search needs to physically touch the inmate with gloved hands. (*Id.*) Two bladed or straightened fingers are used to lift the inmate's testicles, and the backs of both bladed hands are used to separate the inmate's buttocks. (*Id.*) Contact with the inmate's testicles and buttocks is very brief, lasting just a second. (*Id.*) A staff-assisted strip search has to be approved by a supervisor, who must be present during the search. (*Id.* at ¶23.)

According to Scott, all four defendants were present during the search. (*Id.* at ¶43, 45, 46.) Gill's search of Scott yielded no contraband, and Scott was escorted back to his cell without further incident. (*Id.* at ¶39, 47.)

In December 2013 Scott wrote to the Waupun Health Services Department and alleged that he was sexually assaulted by a staff member during a strip search. (*Id.* at ¶80.) In the course of investigating Scott's claim, he was interviewed and described his interaction with Gill:

Q:    . . . was there any . . .

A:    . . . he said, he said, he was like I'm fittin' to use the back
      of my hands to spread your cheeks. And he spread my
      cheeks. Then he went around to the front and he was like,
      I'm fittin' to use the back of my hands to lift your nuts and
      that's what he did.

Q:    So he said he was going to use the back of his hands and
      did he use the back of his hands when he spread your
      cheeks?

A:    I don't know. I can't see back there.

Q:    Did he use the back of his hand when he lifted your . . .

A:    I wasn't look, I wasn't looking down.

Q:    Okay. Did he grope your scrotum?

A:    You say grope like feel on me?

Q2:   Yeah like . . .

A:    Naw. I don't think so.

Q:    Okay. And when he spread your buttocks, did he grope
      your butt?

A:    Like feel on . . .

Q:    Like squeeze it? Grope.

Q2:   Like he's copping a feel, like he's . . .

A:    Naw.   I wouldn't . . . I don't know. He just spread my
      buttocks.

Q2:   How long would you say the contact was? Would you say
      it was a second? You know, ten seconds? How long did . . .

A:    How long it takes to just grab the butt and spread the
      cheeks.  That's how long it was.

Q2:   What about the front?

A:    Same thing.

Q:    Have you ever had a staff assisted strip search done
      before?

A:   No. I've been . . . and this is my third incarceration and I'm 7-1/2 years in and that shit ain't ever happened to me before.

. . .

Q:   When he, when Officer Gill was performing the strip search, did he say anything else to you at that point besides I'm going to use the back of my hand to spread your cheeks and . . . I'm going to use the back of my hand to lift your sack?

A:   Naw.

Q:   He didn't say anything else?

A:   Naw.

(*Id.* at ¶83.)

## II.    SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011).  "Material facts" are those that "might affect the outcome of the suit."  *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations,

stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## III.    ANALYSIS

"Strip searches are not *per se* unconstitutional." *Fillmore v. Page*, 358 F.3d 496, 505 (7th Cir. 2004). For Scott to prevail on his claim that the strip search was unconstitutional, he must show that the search was "maliciously motivated, unrelated to institutional security, and hence totally without penological justification." *Whitman v. Nesic*, 368 F.3d 931, 934 (7th Cir. 2004) (internal quotations and citations omitted). Scott could also demonstrate that the defendants "conducted the physical search of [Scott] in a harassing manner intended to humiliate and inflict psychological pain.'" *Cherry v. Frank*, 125 Fed.Appx. 63, 66 (7th Cir. 2005) (citing *Calhoun v. DeTalla*, 319 F.3d 936, 939 (7th Cir. 2003); *Bruscino v. Carlson*, 854 F.2d 162, 166 (7th Cir. 1988)).

Scott argues that the strip search was not penologically motivated but was motivated by Beahm's desire to harass Scott because he did not respond to him during the morning wellness check. Scott also argues that Beahm lacked the authority to place

him on a linen restriction and that no such restriction was warranted because Umentum was able to get a response from Scott a mere five minutes after Beahm had failed to.

Scott improperly conflates the decision to place him on a linen restriction and the decision to strip search him. These were separate decisions made by different people for different reasons. Beahm recommended the linen restriction because Scott had disobeyed his orders to remove his blankets. Beahm clarifies that, while he does not have final authority to approve a restriction, an inmate will be placed on a recommended restriction immediately, pending approval. If a security supervisor or the security director does not ultimately approve the restriction, the inmate will be taken off the restriction. Here, final approval was given the day after the incident, and the security director ordered that the restriction would remain in effect until November 21, 2013, ten days after the incident occurred. (ECF No. 71 ¶105.)

In this lawsuit Scott was allowed to proceed on a claim challenging the constitutionality of the strip search, *not* on a claim challenging the constitutionality of the linen restriction. Schneider ordered the strip search, not Beahm. He did so because Scott had been uncooperative several times throughout the morning: first, when he failed to uncover himself and, later, when he refused to hand out his linen and exit his cell. Scott was not strip searched because he was placed on a linen restriction; there is no policy requiring that inmates who are placed on a linen restriction automatically be strip searched. (ECF No. 71 ¶107.) Schneider ordered a strip search because, in his

experience, Scott's refusal to comply with orders indicated that he may be trying to hide

contraband.

Scott does not dispute that he failed to respond to orders to uncover himself, nor

does he dispute that he initially refused to hand out his linen or exit his cell.  Instead, he

explains that he was asleep and eventually uncovered himself and eventually handed

out his linen and exited his cell. But as stated by the Court of Appeals for the Seventh

Circuit, "Orders given must be obeyed. Inmates cannot be permitted to decide which

orders they will obey, and when they will obey them. . . ." *Lewis v. Downey*, 581 F.3d 467,

476-77 (7th Cir. 2009) (quoting *Soto v. Dickey*, 744 F.2d 1260, 1267 (7th Cir. 1984)). While

discipline in an institution "no doubt is difficult, [] it is essential if the prison is to

function and provide for the care, safety and security of the staff and inmates . . .

Services to provide food, clothing, health, medical, cleaning, laundry and all other

services would come to an end without discipline. Mob rule would take over." *Soto*, 744

F.2d at 1267.

The court in *Soto* echoed the instructions of the U.S. Supreme Court, reminding

courts that,

> If prison officials are to be free to take appropriate action to ensure
> the safety of inmates and correctional personnel, they must be
> accorded wide-ranging deference in the adoption and execution of
> policies and practices that in their judgement are needed to
> preserve internal order and discipline to maintain institutional
> security. Such considerations are peculiarly within the province
> and professional expertise of correctional officers, and without
> substantial evidence to indicate such officials have exaggerated

their response to these considerations, courts should defer to their judgment. Not only are such administrators in a better position to know and determine what action or remedies are needed and proper, but the operation of our correctional systems and facilities is within the responsibility of the Executive and Legislative branches of government.

*Id*. at 1269 (citing *Bell v. Wolfish*, 441 U.S. 520, 547-48 (1979) (other citations omitted)).

Scott has failed to set forth evidence supporting his contention that the strip search was ordered "totally without penological justification." *See Whitman*, 368 F.3d at 934. Because Schneider has explained the penological justification for his decision and because courts must defer to prison officials' judgment on how best to preserve order and maintain institutional safety, the court finds that the defendants are entitled to summary judgment on this aspect of Scott's claim.

Next the court must determine whether a reasonable jury could conclude that the search was conducted in a harassing manner intended to humiliate and inflict psychological pain on Scott. Scott does not discuss this aspect of his claim in his summary judgment materials.

According to the defendants, during the course of an investigation in 2013 into his complaint that he had been sexually assaulted by Gill, Scott described how the strip search was conducted. Scott explained that Gill told him he was going to use the back of his hands to spread Scott's buttocks and that he was going to use the back of his hand to lift Scott's scrotum. Scott denied that Gill groped him or squeezed him. Scott also denied that Gill said anything to him other than to inform him of what he was about to

do. Finally, Scott conceded that Gill touched him only for the length of time necessary to spread his buttocks and lift his scrotum. Scott's earlier description of the search (which Scott does not now dispute) confirms that Gill's conduct was consistent with DOC policy for staff-assisted searches.[1] The undisputed facts show that the strip search was not conducted in a harassing manner intended to humiliate and inflict psychological pain on Scott, and no reasonable jury could conclude otherwise. As a result, the defendants are entitled to summary judgment on this aspect of Scott's claim as well.

In short, "[t]here is no question that strip searches may be unpleasant, humiliating, and embarrassing to prisoners, but not every psychological discomfort a prisoner endures amounts to a constitutional violation." *Calhoun v. DeTalla*, 319 F.3d 936, 939 (7th Cir. 2003). Although the search was clearly an unpleasant experience for Scott, there is no evidence suggesting that it was constitutionally unacceptable.

## IV.    CONCLUSION

**WHEREFORE, IT IS HEREBY ORDERED** that the defendants' motion for summary judgment (ECF No. 52) is **GRANTED**. The clerk of court will enter judgment accordingly.

---

[1] A video of the strip search exists; however, Scott and the search are obscured by the cell door and the guards surrounding Scott. As such, the video is of little evidentiary value.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rules of Appellate Procedure 3 and 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline, either. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate.

Dated at Milwaukee, Wisconsin this 19th day of September, 2016.

WILLIAM E. DUFFIN
U.S. Magistrate Judge